**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| TAMMY B. GEORGELAS, as Receiver for ROGER S. BLISS, an individual; and ROGER S. BLISS d/b/a ROGER BLISS AND ASSOCIATES EQUITIES, LLC, a Utah limited liability company; ROGER BLISS AND ASSOCIATES CLUB LLC; and BLISS CLUB LLC, <br><br>      Plaintiff, <br><br> v. <br><br> DESERT HILL VENTURES, INC., <br><br>      Defendant. | **JOINT MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT** <br><br> Chief District Judge Robert J. Shelby <br><br> Magistrate Judge Jared C. Bennett <br><br> 2:16-cv-00514-RJS-JCB |
| TAMMY B. GEORGELAS, as Receiver for ROGER S. BLISS, an individual; and ROGER S. BLISS d/b/a ROGER BLISS AND ASSOCIATES EQUITIES, LLC, a Utah limited liability company; ROGER BLISS AND ASSOCIATES CLUB LLC; and BLISS CLUB LLC; <br><br>      Plaintiff, <br><br> v. <br><br> DAVID HILL, an individual, <br><br>      Defendant. | 2:16-cv-00522-RJS-JCB |

The two above-captioned cases both concern whether payments made to an employee of

an alleged Ponzi scheme are subject to disgorgement under the Utah Fraudulent Transfer Act

(UFTA).[1]  Plaintiff in these cases is Tammy B. Georgelas, the Court-Appointed Receiver (the Receiver) for Roger S. Bliss; Roger Bliss and Associates Equities, LLC; Roger Bliss and Associates Club LLC; and Bliss Club LLC (collectively, the Bliss Enterprise).  She has sued in these separate cases Defendants Desert Hill Ventures, Inc. (Desert Hill)[2] and David Hill,[3] contending each received fraudulent transfers under the UFTA in the form of wages paid for work David Hill performed as an employee of the Bliss Enterprise.  She further claims that payments made to contractors to remodel Hill's residence due to his wife's illness are also fraudulent transfers.  The Receiver seeks return of the transfers under the UFTA.  Defendants argue they are not required to return the payments because the Receiver has failed to prove the Bliss Enterprise operated as a Ponzi scheme and that the payments were fraudulent transfers.

Before the court are the Receiver's Motions for Summary Judgment,[4] in which she asks the court to grant her request to avoid the alleged fraudulent transfers and recover the amounts Defendants received or were paid on their behalf.  For the reasons explained below, the Receiver's Motions are GRANTED.

## BACKGROUND[5]

After providing a brief overview of the Bliss Enterprise investment scheme at the heart of the dispute, the court outlines the facts relevant to the individual defendants.

---

[1] In May of 2017, the Utah Voidable Transactions Act was enacted to replace the UFTA.  Because these cases were filed in 2016, the UFTA governs.  Any citation to UTAH CODE ANN. § 25-6-1 *et seq.* (West 2016) refers to the 2016 version of the UFTA in effect when the case commenced.

[2] *Georgelas v. Desert Hill Ventures, Inc.*, 2:16-cv-00514-RJS-JCB.

[3]  *Georgelas v. Hill*, 2:16-cv-00522-RJS-JCB.

[4] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30.

[5] Because this Order pertains to motions for summary judgment, the court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving part[ies]."  *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000) (citation omitted).

## I.   The Bliss Enterprise Investment Scheme

From August 2008 to February 2015, Roger Bliss operated an investment scheme through the various entities of the Bliss Enterprise.[6]  Bliss, a self-proclaimed expert in day-trading Apple stock, promised investors he could earn them large, reliable returns on their investments with little-to-no risk.[7]  He further claimed that, despite a bad trade once every six or seven days, he never had a trading day where he lost money in the past several years.[8]  Bliss told investors they could expect returns of 100% profit each year on their investments, and some years their profit could be as high as 200-300%.[9]  In exchange for his trading expertise, Bliss would split the profits with investors fifty-fifty, meaning, in actuality, he would have to earn 200-600% profit to generate the returns he promised investors.[10]  Bliss explained this was possible because he claimed to trade in excess of $100,000,000 through his multiple trading accounts.[11]  He also presented investors with falsified statements from TD Ameritrade showing a current account balance of $85,000,000, with nearly $5,000,000 in overall profits for a recent one-week period.[12]

To assuage concerns and convince investors there was minimal risk for investing in the scheme, Bliss told investors that the Securities and Exchange Commission (SEC) audited his trading accounts a few times each year and, due to the sheer size of his accounts, called him at

---

[6] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 (Receiver's Motion for Summary Judgment) ¶ 31(a).

[7] *Id.* ¶ 20.

[8] *Id.* ¶ 21.

[9] *Id.*

[10] *Id.*

[11] *Id.* ¶ 22.

[12] *Id.*

least twice a year as part of their anti-money-laundering efforts.[13]  Bliss also had investors sign

contracts stating that Bliss would indemnify them against any losses to their principal

investment.[14]  As further evidence of his financial success, Bliss showcased his own significant

assets, including a cabin at Bear Lake, Utah, many off road vehicles, boats, and an airplane.[15]

Over the course of the investment scheme, the Bliss Enterprise raised approximately

$27.3 million from more than one hundred investors, all of which was deposited directly into

Bliss's personal bank account.[16]  Only half of these funds, $14.0 million, were actually used to

invest in stocks.[17]  Of the total $27.3 million received, Bliss lost approximately $3.5 million in

trading, spent approximately $6.7 million on himself or family members, and returned

approximately $16.3 million to investors—including more than $10 million to "net winners"

who received more than they invested.[18]

### A.  Payments Made to Desert Hill

In 2011, Bliss hired Desert Hill to perform "administrative and ministerial services" for

the Bliss Enterprise.[19]  Through the full-time work of its president, David Hill, Desert Hill

provided services exclusively for the Bliss Enterprise from September 2011 to February 2015.[20]

During that time, Bliss paid Desert Hill a total of $317,000 via consistent monthly payments,

---

[13] *Id.* ¶ 23.

[14] *Id.* ¶¶ 23, 25.

[15] *Id.* ¶ 23.

[16] *Id.* ¶¶ 29, 31(a).

[17] *Id.* ¶ 31(b).

[18] *Id.* ¶ 29.

[19] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 (Defendant's Memo in Opposition) at 8 ¶ 1.

[20] *Id.* at 8 ¶ 3; *see also id.* at 9 ¶ 5 (David Hill worked full-time for the Bliss Enterprise and "did not seek other employment during the time working for Bliss.").

ranging between $5,000 to $16,000.[21]  In response to the Receiver's requests for admission, Desert Hill admitted this amount accurately reflects the payments it received.[22]

### B.  Payments Made to David Hill

As president of Desert Hill, David Hill worked full-time for the Bliss Enterprise from September 2011 to February 2015.[23]  In addition to the payments made to Desert Hill, David Hill was directly compensated $30,000 for the services he provided.[24]  In response to the Receiver's requests for admission, Hill admitted this amount accurately reflects the payments he received.[25]

In 2014, Hill's wife was diagnosed with Amyotrophic Lateral Sclerosis (ALS).[26] Following her diagnosis, Bliss arranged for third-party contractors to perform remodeling work on Hill's home to make it accessible for his wife's wheelchair.[27]  The total amount paid for this work was $113,878.[28]  Hill does not dispute this figure but instead asserts the payments were charitable gifts used solely for the benefit of his wife.[29]

In total, Hill received $143,878 in payments from the Bliss Enterprise.

---

[21] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 at 19.

[22] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30-13, Ex. 12 (Def. Response to Requests for Admission) at 5.

[23] *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 31 (Defendant's Memo in Opposition) at 9 ¶ 3.

[24] *Id.* at 8 ¶ 2.

[25] *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30-13, Ex. 12 (Def. Response to Requests for Admission) at 5.

[26] *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 31 at 10 ¶ 9.

[27] *Id.* at 10 ¶¶ 9, 11.

[28] *See Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30 at 13 ¶ 36.  Specifically, $86,090 was paid to Campbell Construction, and $27,788 was paid to Signature Woodcraft.

[29] *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 31 at 7, 10 ¶¶ 10–11.

## PROCEDURAL HISTORY

On February 11, 2015, the SEC filed in this court a civil enforcement action against the Bliss Enterprise asserting numerous causes of action for securities fraud.[30]  On June 10, 2015, the court appointed the Receiver over the estates of the various entities comprising the Bliss Enterprise,[31] charging her with investigating the Bliss Enterprise and pursuing lawsuits to recover the estates' property.[32]  Since her appointment, the Receiver has, among other things, taken custody and control of the Bliss Enterprise's books, records, and websites and analyzed the information found therein; located and marshaled personal and real property from third parties; interviewed dozens of victims; and pursued discovery from various investors and related parties.[33]  She also retained Lone Peak Valuation Group (Lone Peak), a forensic accounting firm, to analyze the Bliss Enterprise's financial condition from 2008 through February 2015.[34]

On July 17, 2015, the State of Utah filed criminal charges against Bliss for his role in the Bliss Enterprise investment scheme.[35]  On December 11, 2015, Bliss pleaded guilty to four counts of Securities Fraud and one count of Pattern of Unlawful Activity.[36]  He was sentenced on February 26, 2016 to a minimum of four years in state prison, to be served consecutive to a twelve-month federal prison sentence for perjury and obstruction of justice resulting from his

---

[30] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 1; *see also S.E.C. v. Roger S. Bliss et al.*, No. 2:15-cv-0098-RJS (D. Utah).

[31] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 2.

[32] *Id.* ¶ 3.

[33] *Id.* ¶ 4.

[34] *Id.* ¶ 5.

[35] *Id.* ¶ 6; *see also State v. Roger S. Bliss*, Utah State Case No. 151907989 (Utah Dist. Ct., 3rd Dist. Dec. 11, 2015).

[36] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 7.

failure to disclose his ownership of a sailboat.[37]  Bliss was also ordered to repay $21,068,438 in restitution to the victims of his scheme.[38]

On April 19, 2016, this court entered final judgment against Bliss in the civil enforcement action, enjoining him from violating securities laws and ordering him liable for disgorgement of profits gained through his conduct in the investment scheme.[39]  Together with prejudgment interest, the court found Bliss liable in the amount of $13,880,909.20.[40]

On June 8, 2016, the Receiver filed the first above-captioned lawsuit against Defendant Desert Hill,[41] and on March 30, 2017, the Receiver filed the second above-captioned lawsuit against David Hill.[42]  The lawsuits allege the Bliss Enterprise operated as a Ponzi scheme and that both Defendants received fraudulent transfers.[43]  The cases did not meaningfully progress for several years due to an extended stay to resolve the issue of standing in a separate but related lawsuit.[44]  On May 29, 2019, the cases against Desert Hill and David Hill resumed and discovery began.[45]

On November 26, 2019, Jeffrey Pickett, a principal of Lone Peak, issued a report detailing Lone Peak's findings and offering expert opinion that the Bliss Enterprise operated as a

---

[37] *Id.* ¶ 8; *see also United States v. Bliss*, 2:15-cr-00484-CW-DBP-1 (D. Utah Jan. 11, 2016).

[38] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 8.

[39] *See S.E.C. v. Roger S. Bliss et al.*, No. 2:15-cv-0098-RJS, Dkt. 130 (Final Judgment) at 4.

[40] *Id.*

[41] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 12.

[42] *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30 ¶ 13.

[43] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 12; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30 ¶ 13.

[44] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 13; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30 ¶ 15.

[45] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 13–19; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30 ¶ 15–21.

Ponzi scheme.[46]  Pickett is both a Certified Public Accountant and a Certified Fraud Examiner.[47]

He is also Accredited in Business Valuation and Certified in Financial Forensics.[48]  He and

others at Lone Peak reviewed each transaction in Bliss's personal bank account to determine the

source and use of the funds.[49]  The report provided a full accounting of all investors in the Bliss

Enterprise who enjoyed a net profit or suffered a net loss.[50]  The Receiver incorporated the

report's findings in her Motions for Summary Judgment, which she filed separately on February

28, 2020 against Desert Hill and David Hill.[51]  The Motions are now ripe for consideration.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."[52]  A fact is material if it "might

affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."[53]

Under this standard, the court will "view the evidence and draw reasonable inferences

therefrom in the light most favorable to the nonmoving party."[54]  To avoid summary judgment,

the party opposing the motion must set forth specific facts showing a genuine issue for trial and

---

[46] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 17.  Pickett also issued a similar expert report in this matter on February 19, 2017.  To reduce confusion, the second report from 2019 incorporated all the "opinions, bases, schedules, and calculations" from the 2017 report, merging all information into a single account.  *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30-14, Ex. 13(Disclosure of Expert Testimony, Expert Witness Report) at 1:13–17.

[47] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30-14, Ex. 13 at 4:84–86.

[48] *Id.*

[49] *Id.* at 5:122–24.

[50] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 5.

[51] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30.

[52] Fed. R. Civ. P. 56(a).

[53] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[54] *Pirkheim*, 229 F.3d at 1010.

cannot rest on bare allegations.[55]  "A mere scintilla of evidence supporting the nonmoving

party's theory does not create a genuine issue of material fact."[56]

## ANALYSIS

To prevail on her Motions seeking to avoid and recover the payments made to Desert Hill

and David Hill, the Receiver must show two things: (1) that the Bliss Enterprise was a Ponzi

scheme, and (2) that Desert Hill and David Hill received fraudulent transfers as defined by the

UFTA.[57]  Defendants agree they received transfers from the Bliss Enterprise.  The critical

remaining issue is whether the Bliss Enterprise operated as a Ponzi scheme.

"Under the UFTA, once it is established that a debtor acted as a Ponzi scheme, all

transfers by that entity are presumed fraudulent."[58]  This is known as the "Ponzi presumption."

Under this presumption, "[t]he mere existence of a Ponzi scheme is sufficient to establish actual

intent to defraud"[59] as required by the UFTA.[60]

If the Ponzi presumption is established, "the Receiver's burden of proving intent to

defraud shifts, and the transferee then has the burden of establishing a statutory defense from

liability."[61]  Under the UFTA, a transferee may avoid liability "if he or she (1) acted in good faith

*and* (2) gave reasonably equivalent value in exchange for the transfer."[62]

---

[55] *See Anderson*, 477 U.S. at 248, 256.

[56] *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999).

[57] *See Miller v. Kelley*, 1:12-cv-00056-DN, 2014 WL 5437023, at *5 (D. Utah Oct. 27, 2014).

[58] *Wing v. Dockstader*, 482 F. App'x. 361, 363 (10th Cir. 2012) (unpublished) (citing *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008)).

[59] *Donell*, 533 F.3d at 770 (quotation marks and citation omitted).

[60] Under the UFTA, "a fraudulent transfer exists as to a creditor" if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor."  UTAH CODE ANN. § 25-6-5(1)(a).

[61] *S.E.C. v. Mgmt. Sols., Inc.*, No. 2:11-cv-1165-BSJ, 2013 WL 4501088, at *6 (D. Utah Aug. 22, 2013).

[62] *S.E.C. v. Madison Real Estate Grp., LLC*, 647 F. Supp. 2d 1271, 1279 (D. Utah 2009).

The court will first explain why the Ponzi presumption applies in this case and why the payments made to Defendants were fraudulent transfers.

## I.   The Ponzi Presumption Applies Because The Bliss Enterprise Operated as a Ponzi Scheme

A Ponzi scheme is "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments."[63]  Accordingly, the Receiver must show the Bliss Enterprise's underlying business venture was incapable of paying returns to investors and must also "prove by a preponderance of the evidence the *sine qua non* of a Ponzi scheme: that returns to earlier investors were paid by funds from later investors."[64]  Although not essential to the definition of a Ponzi scheme, courts may also consider other factors which indicate a fraudulent Ponzi scheme exists.[65]  These include the promise of consistent, large returns with little to no risk, "the delivery of promised returns to earlier investors to attract new investors," and "the general insolvency of the investment scheme from the beginning."[66]

The Receiver has provided a number of indicia that the Bliss Enterprise was a Ponzi scheme.  First, with the exception of a miniscule amount of deposits from various other sources, the investment scheme's only source of cash was investor funds.[67]  All money from investors was

---

[63] *In re M & L Bus. Mach. Co., Inc.*, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996) (citations omitted).

[64] *Mgmt. Sols.*, 2013 WL 4501088, at *19.

[65] *Id.*

[66] *Id.*; *see also In re M & L*, 84 F.3d at 1332 n.1 ("Typically, investors are promised large returns for their investments.  Initial investors are actually paid the promised returns, which attract additional investors.").

[67] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30-14, Ex. 13 at 8:195–98.  Pickett noted that in addition to the $27.3 million raised from investors, there were "approximately $215,000 in deposits from various sources that do not appear to be investor funds."  This amount represents less than 1% of the funds received by the Bliss Enterprise. The more than 99% remaining funds were solely investor deposits.  *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 34 (Receiver's Reply) at 7 n.20.

deposited into Bliss's personal Wells Fargo checking account, and all payments distributed to investors, employees, and third-party contractors were also made from the same account.[68]

Second, the Bliss Enterprise's sole underlying business venture—day-trading Apple stocks—was demonstrably incapable of paying the promised returns to investors.  From its inception in August 2008 until its collapse in February 2015, the Bliss Enterprise raised approximately $27.3 million from investors.[69]  However, only $14.0 million of that amount was ever invested in the stock market.[70]  Based on that sum, Bliss had to earn a minimum 300% annual return on the invested funds just to meet the 100% promised return to investors, without even considering the higher rates of return he had also promised.[71]  But rather than earn a profit, the investment records show Bliss lost nearly $3.8 million trading stocks.[72]  Over the seventy-seven months the scheme was active, there were only seven months when the Bliss Enterprise experienced positive monthly income from day-trading activities.[73]  But on a cumulative basis, there was only one month with positive income that actually earned a profit.  In August 2008, the first month in which investor funds were received and invested, the Bliss Enterprise earned a total of $60.50.[74]  Thereafter, the Bliss Enterprise suffered continually-growing losses that were never alleviated through later trading activity.[75]  The Bliss Enterprise was not a profitable

---

[68] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30-14, Ex. 13 at 20:444–51.

[69] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 31(a).

[70] *Id.* ¶ 31(b).

[71] *Id.*

[72] *Id.*

[73] *Id.* ¶ 31(c).

[74] *Id.*

[75] *Id.*

venture, and it was never capable of producing enough profits to cover the returns promised to investors with legitimate funds.

Third, the Bliss Enterprise was insolvent from its second month of existence until its demise in February 2015.  Its liabilities were always greater than its assets, and it never had the ability to pay debts to investors as they came due.[76]  The Bliss Enterprise remained afloat only by relying on cash infusions from new investors.

Fourth, as previously explained, Bliss promised all investors consistent yearly returns of at least 100% or more and assured them there was no risk to their capital because of his self-proclaimed expertise in trading.  He also delivered the promised returns to certain early investors.  Based on the foregoing evidence, the court can only conclude that these payments to the "winning investors" were made with the funds supplied by new investors—the *sine qua non* of a Ponzi scheme.  The court also concludes the payments made to Desert Hill and David Hill as employees of the Bliss Enterprise could have only been made with funds supplied by the scheme's investors.

Defendants argue that the Receiver has not provided sufficient evidence to prove the Bliss Enterprise was a Ponzi scheme.[77]  Specifically, they contend: (1) the Receiver is not entitled to the Ponzi presumption because the Bliss Enterprise sometimes acted with legitimacy, experiencing positive monthly income during seven months of the scheme's total time-frame, and (2) the Receiver has not shown the Bliss Enterprise was a Ponzi scheme at all times when it made payments specifically to Desert Hill and David Hill.[78]

---

[76] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 34 (Receiver's Reply) at 5–8.

[77] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 (Defendant's Opposition) at 13; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 31 (Defendant's Opposition) at 15.

[78] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 at 13–15; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 31 at 15–16.

Defendants rely on a single case to support their arguments, *S.E.C. v. Management Solutions, Inc.*, involving a real estate property investing scheme.[79]  The alleged Ponzi enterprise in that case operated for more than fifteen years and had 208 separate business entities, multiple bank accounts, various streams of investment funds, and a large property portfolio.[80]  The business entities involved displayed "the characteristics of commercial schizophrenia," with the Ponzi-like activity often coming and going "depending on time, circumstance, money source, and transaction."[81]  Sometimes the enterprise's actions were legitimate, and other times "patently unlawful."[82]  As such, the court held the Receiver was not entitled to the "Ponzi presumption" and required that each transaction be analyzed separately to determine whether the individual transfers were legitimate or fraudulent.[83]

Defendants insist the Bliss Enterprise is similar to the defendant in *Management Solutions* and urge the court to require the same individual analysis of the transfers at issue here. They argue the Receiver must prove the Bliss Enterprise was operating as a Ponzi scheme at all times, and they should not be required to disgorge payments that potentially came from the seven months the Bliss Enterprise experienced positive monthly income from trading.[84]  The court disagrees.

The Bliss Enterprise's actions are legally and factually distinct from the defendant's in *Management Solutions*.  First, the law in the Tenth Circuit does not suggest the "Ponzi

---

[79] *Mgmt. Sols.*, 2013 WL 4501088.

[80] *See id.* at *4–5.

[81] *Id.* at *21.

[82] *Id.*

[83] *Id.* at *21–22.

[84] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 at 14–15; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 31 at 15–16.

presumption" should be limited only to those circumstances where "the purported business venture is assetless and fraudulent from day one."[85]  Indeed, "the Tenth Circuit has found enterprises to be Ponzi schemes even when there is a legitimate, underlying business operation that manages to produce some amount of revenue."[86]  For example, in *Sender v. Simon*, the Tenth Circuit considered an investment scheme where the operator "used invested funds to trade in securities options over the life of the operation."[87]  Although the operation suffered net trading losses in most years, it did manage to earn "net profits in a few years."[88]  Despite this fact, the court confirmed the operation was "an elaborate and long-running Ponzi scheme."[89]

Second, unlike the defendant in *Management Solutions*, the Bliss Enterprise was not a complicated mixture of legitimate and fraudulent business activities.  It was "a simplistic duplicate" of the scheme originally attributed to Charles Ponzi: borrowing large amounts of money from a multitude of investors, promising high rates of return, delivering preferential payments to early investors, holding no assets other than investor funds, and based only on Bliss's "self-promoted rumors of success" in day-trading Apple stocks.[90]  That Bliss managed seven legitimately successful months of trading out of the seventy-seven months his scheme was in operation does not change the fact that the Bliss Enterprise was never a successful venture. Neither Desert Hill nor David Hill have produced evidence to refute the undisputed fact that, from its second month, the Bliss Enterprise continually operated at an ever-growing loss,

---

[85] *Miller*, 2014 WL 5437023, at *6 (internal quotation marks and citation omitted).

[86] *Id.*; *see also In re M & L*, 84 F.3d at 1332 ("In the mid–1980s, officers of the debtor M & L began running a Ponzi scheme[][u]sing the company's legitimate operations as a computer sales and leasing company as a front.").

[87] 84 F.3d 1299, 1302 (10th Cir. 1996).

[88] *Id.*

[89] *Id.* at 1301.  "[B]ecause the fund had no real cumulative earnings," investor disbursements were paid "from the capital contributions of other investors." *Id.* at 1302.

[90] *Mgmt. Sols.*, 2013 WL 4501088, at *20.

including during the period in which it made payments to Defendants.  Even though it had some legitimate business operations, it was never capable of producing enough revenue to cover with legitimate funds the distributions it made to investors and employees.

The Bliss Enterprise was operated as a Ponzi scheme overall.[91]  The Receiver has established that the returns paid to certain investors, and the payments made to Defendants, could only have been paid with other investors' money.  Accordingly, the "Ponzi presumption" applies, and all transfers made by the Bliss Enterprise to Desert Hill and David Hill are presumed to be fraudulent.  Having so found, the court will now explain why Defendants have failed to establish an affirmative defense to the fraudulent transfers.[92]

## II. Defendants Have Not Established an Affirmative Defense Because the Transfers Were Not Made for Reasonably Equivalent Value

The UFTA "provides an affirmative defense to an otherwise fraudulent transfer if the transferee accepted the transfer in good faith and for a reasonably equivalent value."[93]  In the context of a Ponzi scheme, however, "[t]hose who receive money for bringing new investors to a scheme have not given reasonably equivalent value within the meaning of the Uniform Fraudulent Transfer Act, and must return the money."[94]  This is based on the theory that an employment relationship which is "created and operated in furtherance of a fraudulent and illegal investment scheme," and which serves "to give the scheme a veneer of legitimacy, [is] in utter complicity with [the scheme's] fraud."[95]

---

[91] *Miller*, 2014 WL 5437023, at *7.

[92] *Wing v. Williams*, No. 2:09-cv-399, 2011 WL 891121, at *4 (D. Utah Mar. 11, 2011).

[93] *Id.* (citing UTAH CODE ANN. § 25-6-9(1)).

[94] *Miller v. Taber*, No. 1:12-cv-74-DN, 2014 WL 317938, at *2 (D. Utah Jan. 29, 2014) (unpublished).

[95] *Sender* 84 F.3d at 1307.

Defendants maintain they should be allowed to keep the payments they received from the Bliss Enterprise for three reasons.  First, because neither Desert Hill nor David Hill were investors in the Bliss Enterprise, the Ponzi presumption should not apply to the transfers made to them.[96]  Without the presumption, Defendants contend the Receiver is unable to establish the "actual intent to defraud" required under the UFTA.[97]  Second, Defendants insist that even if the Ponzi presumption does apply to them, the payments they received from the Bliss Enterprise were given in good faith and exchanged for a reasonably equivalent value.[98]  And finally, regarding the payments made to third-party contractors to remodel David Hill's home, Hill maintains he never personally received the payments because they were made to third-party contractors solely for the benefit of his disabled wife.[99]  Because he did not receive the benefit of the transfers, Hill argues he should not be required to return the payments.[100]  The court will address each argument in turn.

### A.  The Ponzi Presumption Applies to Non-Investors

"Under the UFTA, once it is established that a debtor acted as a Ponzi scheme, *all* transfers by that entity are presumed to be fraudulent."[101]  The UFTA does not distinguish between investors and non-investors.  Nonetheless, Defendants attempt to categorize the activities they performed on behalf of the Bliss Enterprise merely as services rendered, which should be considered separately from the scheme's investors who are subject to the Ponzi

---

[96] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 at 12–13; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 31 at 13–15.

[97] *See* UTAH CODE ANN. § 25-6-5(1)(a).

[98] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 at 15–16; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 31 at 16–17.

[99] *See Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 31 at 18–19.

[100] *Id.* at 19.

[101] *Wing v. Dockstader*, 482 F. App'x. at 363 (emphasis added).

presumption.  Defendants point to *In re Hedged-Investments Assocs., Inc* as an example of the
Tenth Circuit drawing a distinction between investors and non-investors with respect to
preferential transfers under bankruptcy law,[102] and they urge the court to apply the same
distinction in the context of fraudulent transfers.[103]  The court declines to do so.

Under 11 U.S.C. § 547(c)(2), a trustee in bankruptcy may not avoid a transfer that was
made to a debtor in the ordinary course of business affairs.  But Defendants are not debtors in
bankruptcy, and this is not a bankruptcy case.  Therefore, "the avoiding powers under the
Bankruptcy Code are unavailable."[104]  And although Defendants argue they were simply
compensated for providing "administrative services" in the ordinary course of business affairs,[105]
the Tenth Circuit has suggested that, outside of the bankruptcy context, it is not appropriate for a
district court to ignore "the impact the services had on perpetuating the fraudulent scheme."[106]
Here, Desert Hill and David Hill were not merely passive outsiders who were "more akin to the
venture's utility provider."[107]  They were inside employees, intimately involved with the Bliss
Enterprise's day-to-day operations.  Within the contours of the UFTA, the court cannot ignore
the impact Defendants' work had on perpetuating Bliss's fraudulent investment scheme.

---

[102] *In re Hedged-Investments Assocs., Inc.*, 48 F.3d 470, 476 (10th Cir. 1995) ("Transfers made to non-investor creditors, in the ordinary course of business and according to ordinary business terms, may be protected from preference avoidance under § 547(c)(2).").

[103] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 at 12.

[104] *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005).

[105] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 at 13.

[106] *Wing v. Dockstader*, 482 F. App'x. at 365 ("The [Defendants] rely on several bankruptcy cases for the proposition that the determination as to whether reasonably equivalent value was given should not take into account the impact the services had on perpetuating the fraudulent scheme . . . Outside the bankruptcy context, other circuits have rejected [this] position.") (citing *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006)).

[107] *Wing v. Dockstader*, No. 2:08-cv-776, 2010 WL 5020959, at *6 (D. Utah Dec. 3, 2010), *aff'd* 482 F. App'x. 361 (10th Cir. 2012) (unpublished).

The Receiver has succeeded in establishing the Bliss Enterprise was a Ponzi scheme, which renders the payments made to Defendants fraudulent transfers.  The court will not undermine the UFTA by declining to apply the Ponzi presumption to the payments made to Defendants simply because Desert Hill and David Hill were not investors in the scheme.

### B.  The Transfers to Defendants Were Not Made for Reasonably Equivalent Value

Under the UFTA, payouts from a Ponzi scheme "do not qualify as fraudulent transfers if the defendants provided reasonably equivalent value and received the payments in good faith."[108] Defendants assert that the administrative and ministerial services provided by David Hill, through Desert Hill, furnished reasonably equivalent value for the salary payments Defendants collected from the Bliss Enterprise.[109]  Defendants further contend the payments were received in good faith because they were "wholly in the dark regarding Bliss's scheme"[110] and were prevented from discovering the scheme's fraudulent nature because they did not have access to Bliss's actual financial records and only prepared documents based on the numbers provided to them by Bliss.[111]

In response, the Receiver does not here dispute whether Defendants had knowledge the Bliss Enterprise was a Ponzi scheme,[112] but instead argues the work rendered by Desert Hill and

---

[108] *Id.* at *5.

[109] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 at 13.

[110] *See Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 31 at 14.

[111] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 at 9 ¶ 8.

[112] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 34 at 2 ("Desert Hill's knowledge regarding the fraudulent investment scheme is immaterial to this Motion for Summary Judgment or Desert Hill's obligations to disgorge itself of the payments it received.  The Receiver reserves her right to challenge Desert Hill's claim of ignorance at trial."); *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 32 (Receiver's Reply) at 13 (same).

David Hill cannot be considered reasonably equivalent value because it helped perpetuate the scheme's fraud and exacerbated the harm to the victims.[113]  The court agrees with the Receiver.

Even if Defendants "acted in good faith, without any intent to assist the debtor to defraud or evade creditors," they cannot be relieved of liability "if the transfer was exchanged for less than reasonably equivalent value."[114]  Here, ensuring the smooth operation of the Bliss Enterprise and helping to entice new investors into the scheme cannot be considered reasonably equivalent value.  Defendants insist David Hill was nothing more than an administrative assistant to Bliss, whose duties included updating investor spreadsheets, circulating statements and spreadsheets to investors, receiving and maintaining investor agreements, coordinating investor withdrawal requests, serving as the administrative conduit for questions from investors to Bliss, and maintaining the Bliss Enterprise website.[115]  Defendants further contend they were not paid to solicit new investors and were only providing facially lawful work for which they contracted with Bliss to furnish.[116]

But the list of services Defendants provided merely illustrates how intimately intwined they were with enabling and furthering the investment scheme, and how they "helped endow the scheme with a façade of legitimacy."[117]  The falsified spreadsheets and investor statements circulated by Defendants, along with the fraudulent website maintained by Defendants, convinced victims the Bliss Enterprise was actually earning the exorbitant profits it falsely

---

[113] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 34 at 9.

[114] *Warfield v. Carney*, No. 3:04-cv-633-R, 2007 WL 1112591, at *12 (N.D. Tex. Apr. 13, 2007).

[115] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 at 8–9. This is not an exhaustive list of Defendants' duties.

[116] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33 at 15.

[117] *Sender*, 84 F.3d at 1308.

promised.[118]  While Defendants may not have directly solicited new investors, the services they provided were central to convincing new and current investors the Bliss Enterprise was a profitable venture—thereby encouraging them to invest more money into the scheme.

Neither may the court credit nor enforce employment agreements Defendants had with the Bliss Enterprise "whereby Bliss agreed to compensate Defendant[s] on a regular basis for services validly rendered."[119]  As the Tenth Circuit explains, "a bargain may be illegal by reason of the wrongful purpose of one or both parties making it.  This axiom is true even though the performances bargained for are not in themselves illegal and even though in the absence of the illegal purpose the bargain would be valid and enforceable."[120]  It is evident that Bliss hired Desert Hill and David Hill to give the Bliss Enterprise a "veneer of legitimacy" in order to placate current investors and entice new ones.[121]  Consequently, Defendants were "in utter complicity" with Bliss's fraud—even if they did not intend to promote it.[122]  Those who entice investors into a Ponzi scheme or help perpetuate the scheme's fraudulent actions, "whether knowingly or not, [are] just as involved, and even more involved, in furthering the scheme as a passive investor."[123]  As such, Desert Hill and David Hill "cannot benefit from any illegal contract or agreement with [Bliss] or for [their] contribution in keeping [the Bliss Enterprise's] fraudulent schemes afloat."[124]

---

[118] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 34 at 3–4.

[119] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 36.

[120] *Sender*, 84 F.3d at 1308.

[121] *Id.* at 1307.

[122] *Id.*

[123] *Wing v. Dockstader*, 2010 WL 5020959, at *6.

[124] *Id.*

C.  **The Payments Made to Remodel Hill's Home are Fraudulent Transfers and Must Be Repaid Because Hill Personally Benefited from Them**

Under the UFTA, the Receiver may recover a fraudulent transfer from "the first transferee of the asset or the person for whose benefit the transfer was made."[125]  As previously established, the Bliss Enterprise was a Ponzi scheme and all transfers it made are presumed to be fraudulent, including the payments made to third-party contractors for the purposes of remodeling David Hill's home.

Hill maintains the payments made for the remodel are not subject to disgorgement because he did not personally receive them or benefit from them.[126]  He argues the payments were a charitable donation made on behalf of his wife following her diagnosis in 2014 with ALS.[127]  Bliss arranged for the contractors to perform the remodeling work and transferred the payments directly to the contractors rather than to Hill.[128]  In addition, all the remodeling work involved modifications pursuant to ADA specifications to make Hill's home accessible for his wife's wheelchair.[129]  Thus, Hill contends the remodeling of his home solely benefited his disabled wife.[130]

The Receiver counters that Hill did in fact benefit from the modifications made to his home.  During the entirety of the time he worked for the fraudulent Bliss Enterprise, Hill held title to his home with his wife as joint tenants.[131]  Any improvements made to the home therefore

---

[125] UTAH CODE ANN. § 25-6-9(2)(a).

[126] *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 31 at 19.

[127] *Id.* at 10 ¶¶ 9–10.

[128] *Id.* at 18–19.

[129] *Id.* at 10 ¶¶ 9, 12.

[130] *Id.* at 19.

[131] *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 32 at 12.

benefited his equal and undivided interest in the property.[132]  Additionally, Hill himself explained that his full-time employment arrangement with Bliss allowed him to work from home and provide care for his children and ailing wife.[133]  As a caregiver, any ADA modifications also benefited Hill because they would have made his caregiving duties easier.[134]

It is not disputed that Hill lived in the home while he was employed by the Bliss Enterprise and benefited from the improvements made to the property while his wife was alive. Hill continues to live in the home and has retained all the value from the remodel.  As explained above, Hill has not established an affirmative defense because he did not provide reasonably equivalent value for the transfers he received, including the payments made to remodel his home. Because Hill was the person "for whose benefit the tranfer[s] were made," the Receiver is entitled under the UFTA to recover the value of the transfers.[135]

The court is aware that requiring repayment by Defendants likely will create significant hardships.  The court presumes Desert Hill and David Hill believed the payments they received were legitimate, and it has been years since the money was received and spent.  Worse, Defendants may have passed on other financial opportunities in favor of working for the Bliss Enterprise.  The court is naturally sympathetic to their difficult circumstances, but allowing Defendants to retain the transfers they received "would be to further the [Bliss Enterprise's] fraudulent scheme at the expense of other[s]."[136]  The money used to pay for the salaries of Desert Hill and David Hill, and the money used to remodel Hill's home, came from innocent

---

[132] *Id.*; *see also* UTAH CODE ANN. § 57-1-5(4) (West 2020).

[133] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 33-1, Ex. A (Hill Decl.) ¶ 14.

[134] *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 32 at 13.

[135] UTAH CODE ANN. § 25-6-9(2)(a).

[136] *In re Hedged-Investors*, 84 F.3d at 1290.

investors who did not voluntarily donate their money to help Hill and his family.[137]  The collapse of a Ponzi scheme leaves a multitude of victims in its wake.  Many victims suffer consequences equally or more tragic than those Defendants will experience when required to repay the monies unlawfully received from the Bliss Enterprise.  Ultimately, "[e]quity compels that [Desert Hill and David Hill] share some of the hardship equally with those who lost their initial investment."[138]

To date, the vast majority of Bliss's victims have received little to nothing for the money they invested in the Bliss Enterprise.  Despite the Receiver's return of just over $2.4 million to investors, there remain valid claims of more than $12.1 million against the Receivership Estate.[139]  Desert Hill admits it received $317,000 in payments from the Bliss Enterprise,[140] and David Hill admits he received $30,000 in payments[141] and does not dispute the amount of $113,878 paid to third-party contractors to remodel his home.[142]  The court finds that, under the "Ponzi presumption," these amounts represent fraudulent transfers under the UFTA.  Because both Defendants have failed to establish an affirmative defense, they are liable for the amounts stated.

### III.    The Court Will Not Reach the Receiver's Unjust Enrichment Claims

The Receiver argues, in the alternative, that she is entitled to summary judgment because Desert Hill and David Hill received a benefit from the Bliss Enterprise in the form of payments

---

[137] *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 32 at 15.

[138] *Donell*, 533 F.3d at 780.

[139] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 ¶ 30.

[140] *Id.* ¶ 35.

[141] *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30 ¶ 37.

[142] *See Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30 at 2.

they received as employees of the scheme and were, therefore, unjustly enriched.[143]  Having

already decided under the UFTA that the payments are avoidable fraudulent transfers, it is not

necessary for the court to reach the unjust enrichment claim.

## CONCLUSION

For the foregoing reasons, the Receiver's Motions for Summary Judgment[144] are

GRANTED.

SO ORDERED this 4th day of January 2021.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[143] *See Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30 at 20–21; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30 at 20–21.

[144] *Desert Hill*, 2:16-cv-00514-RJS-JCB, Dkt. 30; *Hill*, 2:16-cv-00522-RJS-JCB, Dkt. 30.